Lillie Brokaw, Administratrix of Estate of Lester Brokaw, Deceased, Plaintiff-Appellant, v. East St. Louis Jockey Club, Inc., Defendant-Appellee.

Term No. 56–M–8.

Fourth District.

October 9, 1956.

Released for publication February 4, 1957.

Morris B. Chapman, and John Gitchoff, both of Granite City, for plaintiff-appellant.

Schaefer O'Neill, of Alton, for defendant-appellee.

JUSTICE BARDENS delivered the opinion of the court.

Plaintiff's intestate, a 17-year-old boy, was killed in a fall while riding as a jockey in a race at defendant's track, Cahokia Downs, near East St. Louis, Illinois. A jury trial in the Circuit Court of Madison County resulted in a verdict for plaintiff. The trial court, however, entered judgment for defendant notwithstanding the verdict. Plaintiff appeals, contending that there was sufficient evidence of defendant's negligence in the construction and operation of the track to require submission of the issues to a jury.

Cahokia Downs, a three-quarter mile track for running (as contrasted with trotting) races was built by defendant in 1953 and 1954. The racing strip was

first used in April, 1954. Decedent started riding in races in June, 1954, and had been riding an average of two races a night at Cahokia Downs. For several days prior to the night of decedent's death it had rained heavily, and the track had become quite muddy. On the night of October 29, 1954, while riding in a race, decedent's horse suddenly went down, turned a somersault, and crushed decedent. Plaintiff's contention was that the horse's front hoofs went into a hole in the substructure of the track, causing it to fall. In support of such theory, plaintiff attempted to prove that the track was in an exceptionally hazardous condition on the night of the accident because it was (1) negligently and improperly constructed, and (2) negligently maintained.

■■■ With respect to the first allegation, we note that extensive evidence relating to the construction of the track was received from the architect, general contractor, and others connected with its construction. It appears that the substructure was hard packed clay. The actual running surface was the customary five or six inches of loose dirt or "loam" which provided a cushion for the horse's hoofs. Evidence was introduced of various preliminary studies of construction, soil conditions, and track surfaces at other tracks throughout the country before construction at Cahokia Downs was started. The surface used was that recommended for running races by one versed in that subject after soil studies at Cahokia Downs. No evidence was offered by plaintiff to contradict the substance of defendant's contention that the track was carefully constructed after preliminary studies and surveys at other tracks. Plaintiff's case on this issue was predicated on the inference that a better type of track construction was available although no evidence of such preferred construction was produced, and a suggestion that those who built Cahokia Downs having

245

not previously built a track, could not, therefore, have constructed this track properly and safely. Inference and suggestion afford no substitute for evidence. In this case there is no evidence permitting of the conclusion, directly or indirectly, that Cahokia Downs was negligently constructed, and the jury should not have been permitted to speculate on this issue.

Plaintiff's evidence on the issue of track maintenance established that it had rained heavily for several days and the track was so muddy that no harrowing of the running surface had been attempted. One witness testified that he had ridden around the track the day before and his horse had stumbled and slipped in holes. This same witness described how, on the morning following the accident he traced the hoof prints of decedent's mount near the spot of the accident and found two front hoof indentations about eight to ten inches deep rather than the normal five to six inches. On cross examination, he stated that there were other nine-inch deep hoof marks and some even deeper on the track. He also testified on cross examination that four horses for which he was trainer ran in races after he had observed various holes in the track. The track manager testified that on one occasion various jockeys refused to ride because of the muddy conditions; they also declined to ride any more races the night decedent was killed.

From all the testimony, it is clear that because of the heavy rain, the substructure, as well as the loose dirt on the surface of the track, was in very muddy condition. Plaintiff's testimony indicates that the "holes," or nine-inch-deep hoof prints, were to be found throughout the track. Therefore, it was the general condition of the track rather than an isolated hazard that caused decedent's mount to fall.

We have examined the abstract of the record carefully and find no evidence or reasonable inferences of

negligence on defendant's part. The evidence simply establishes that the track was in a hazardous condition on account of continual rain, but it is not shown that such condition was unusual in the light of the prevailing weather. No standard of track care or condition is shown against which the defendant's operation of Cahokia Downs can be measured nor is any evidence offered to show there is any method of preventing the deeper sinking in of horses hoofs on a muddy track.

A factor to be considered in connection with the issue of maintenance and operation of the track is the fact, as brought out by defendant's evidence, that the Illinois Racing Board generally supervises racing at all tracks in the State of Illinois. A steward is assigned by the Board to each track for the racing season and, as agent of the Board, he is charged with supervision of the track and enforcement of the rules and regulations adopted by the Illinois Racing Board. The steward assigned to Cahokia Downs, Judge Ralph Choisser, testified as follows:

"Racing days are allocated by the Board on application of the track. The track pays a license fee of $500.00 to the Board before the meeting starts. The Racing Board has a right to cancel the dates on which racing is allocated to a track. Any of the agents of the Board could cancel a race, including the steward, but the track cannot, without the approval of the Board. When application is made for racing, the Board examines the track to determine its fitness for racing.

"In 1954, prior to the opening of this track, the chairman of the Board and one of its members made an inspection of the track including the racing stretch. This was in the latter part of June. I don't know the exact date. They made a determination that it was fit for racing prior to its opening, and also I had a duty to make an inspection and recommendation as to its fitness, which I did, and declared it fit for racing."

247

■ Therefore, plaintiff cannot charge defendant with negligence in failing to stop the racing program since it had no legal right to do so.

■ The testimony makes it clear also that a jockey was free to refuse to ride if he felt the track too hazardous. On certain occasions, several jockeys did refuse to ride. That such decision might affect demand for a jockey's services subsequently, does not alter the fact. This freedom not to ride, together with the fact that a jockey would be in perhaps the best position to know the condition of the track, and the unusual hazards existing, lends further support to the decision of the trial court.

All witnesses agreed that horse racing is hazardous under normal conditions because of the nature of the sport. On a muddy, slippery track, it becomes extra hazardous. The defendant, under the laws regulating racing, had no right to call off a race because of track conditions. Further, the defendant had no superior knowledge because the decedent was in as good position as anyone to know the condition of the running surface, having ridden on the track for almost five months. He was free to refuse, but chose to ride on the night in question.

Both parties discuss the case of Gray v. Pflanz, 341 Ill. App. 527, 94 N.E.2d 693, decided by this court. In the Gray case the action was against an employer and we held the jockey assumed the risks involved in his trade. We base our decision here on the absence of proof of negligence coupled with equal knowledge of the conditions of the premises by plaintiff's intestate.

Judgment affirmed.

SCHEINEMAN, P. J. and CULBERTSON, J., concur.